1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **HENRY A. ORTIZ, JR., a minor by and through His Guardian Ad Litem, ARACELI CERVANTES ORTIZ,** ) ) ) | **CIV F 03-6541 AWI SMS** |
| ) **Plaintiff,** ) | **ORDER ON THE UNITED STATES'S RULE 12(b)(1) MOTION, or in the alternative, MOTION FOR SUMMARY JUDGMENT** |
| **v.** ) ) | |
| **UNITED STATES OF AMERICA, and DOCTOR'S MEDICAL CENTER,** ) ) ) | |
| ) **Defendants.** ) ) | |

This a Federal Tort Claims Act ("FTCA") case in which minor Plaintiff Henry Ortiz, Jr. ("Plaintiff") seeks damages for alleged medical malpractice during his birth. Plaintiff's original suit included Dr. Sylvia Diego and Doctor's Medical Center. On June 22, 2004, the United States was substituted as a party because it acknowledged that Dr. Diego was working for a federally funded clinic and was acting in the course and scope of her duties. See Court's Docket Document No. 21. On December 9, 2005, Doctor's Medical Center filed a notice of settlement.[1] See id. at 55. The remaining defendant the United States ("Defendant") now moves to dismiss this case under Rule 12(b)(1) and alternatively moves for summary judgment. The United States argues that Plaintiff's claim accrued between November 8 and 11, 2000, but the Department of

---

[1]Doctor's Medical Center and Plaintiff have yet to file dismissal papers with the Court.

Health and Human Services ("HHS") did not receive the FTCA claim until December 27, 2002. The Court will deny the motion.

## BACKGROUND[2]

On November 8, 2000, Plaintiff was born to Araceli Cervantes Ortiz and Henry Ortiz, Sr. at Doctor's Medical Center in Modesto, California. See Defendant's Undisputed Material Fact ("DUMF") Nos. 1(a), (b), 2. This was Mrs. Ortiz's first pregnancy. See Plaintiff's Undisputed Material Fact ("PUMF") No. 3. Mrs. Ortiz understands very little English, and Mr. Ortiz, who was born in Brooklyn, New York,  understands a higher level of English, but has some trouble communicating in English.[3] See DUMF Nos. 1(b), (d); Response to DUMF No. 1(d). Mrs. Ortiz has an elementary school education and Mr. Ortiz has an eleventh grade education. PUMF No. 2. Mrs. Ortiz had an uneventful pre-natal course during the pregnancy and a vaginal delivery was anticipated by her physician, Dr. Christopher Grover. See DUMF No. 2. However, the following complications arose during the delivery on November 8, 2000: (1) Mrs. Ortiz developed a fever, although this was not uncommon during a delivery; (2) the fetus developed tachycardia (accelerated heart rate); (3) the fetus's head was delivered but his shoulder became lodged behind his mother's pubic bone, i.e. shoulder dystocia, effectively blocking his continued delivery; (4) during the period of dystocia, Plaintiff experienced asphyxia for several minutes as the doctor (Dr. Diego) and nursing staff worked to dislodge the shoulder and complete delivery; and (5) Plaintiff required resuscitation following the delivery. See DUMF No. 3. Dr. Sylvia Diego was the doctor who performed the delivery and used a vacuum device to pull Plaintiff's head out of the birth canal. See PUMF No. 6.

Mr. Ortiz was by his wife's side during the delivery and the Ortizes did not see or hear anything that Dr. Diego did during the delivery. See PUMF Nos. 4, 5. The Ortizes have no

---

[2]The parties consecutively numbered their evidence with Bates numbers.  A reference to "P.B. at 2" means "Plaintiff's Evidence Bates Stamped 2," and "D.B. at 2" means "Defendant's Evidence Bates Stamped 2."

[3]The exact degree of Mr. Ortiz's English fluency is unclear.  What does seem to be clear is that Mr. Ortiz understands substantially more English than Mrs. Ortiz.

medical training and neither appreciated that there was a problem during delivery.  See PUMF

Nos. 1, 8.  Dr. Diego did not speak to the Ortizes about what occurred to Plaintiff during the

delivery.  See PUMF No. 12.  However, at the delivery, Mr. Ortiz learned that Plaintiff had been

born dead, revived after about 10 minutes, and then taken out of the delivery room.  See PUMF

No. 11.

From November 8 to December 14, 2000, Plaintiff remained in the neonatal intensive

care unit ("NICU") of Doctor's Medical Center.  See DUMF No. 5; Plaintiff's Response to

DUMF No. 4.  On December 14, 2000, Plaintiff was transferred to Lucile Packard Children's

Hospital at Stanford for placement of a gastrostomy tube ("g-tube") in his abdomen for feeding

and medications.  See DUMF No. 5.  After being continuously hospitalized since birth

(November 8, 2000), Plaintiff was discharged home with his parents around December 25, 2000.

Id.  Prior to his discharge, Plaintiff was seen on multiple occasions by a pediatric neurologist, Dr.

Lawrence Wang, and a neonatalist, Dr. Frederick Murphy.  Neither Dr. Wang nor Dr. Murphy

have independent recollections of Plaintiff, the Ortizes, or discussions with the Ortizes.  See

DUMF Nos. 5, 10; Plaintiff's Response to DUMF Nos. 5, 10.  In early 2001, the Ortizes took

Plaintiff to pediatrician Dr. Sonia Lee, who told them that Plaintiff had suffered from cerebral

palsy and permanent brain damage.  See PUMF No. 24.

### Presentment of the Claim

After consulting with attorneys, the Ortizes mailed an FTCA claim to the United States

Naval Legal Services agency ("the Navy") in Norfolk, Virginia on October 9, 2002.  See P.B. at

187.  The appropriate agency, however, was HHS in Rockville, Maryland.  The claim was

received by the Navy on October 11, 2002.[4]  See P.B. at 6; DUMF No. 21(c).  Shelton Brown, a

claim assistant for the Navy, was the person who received the claim.  See P.B. at 6-7; DUMF No.

22(b).  Brown testified that he would normally review the information contained in Block 8 of a

---

[4]Defendant states that the Navy acknowledges receipt of the claim on October 11, 2002, but cannot confirm that the delivery included the tort claim.  See DUMF No. 21(c).  Defendant assumes for this motion only that the overnight package included a tort claim but reserves the right to challenge receipt in further proceedings.  Id.

claim form to determine whether to process a claim or transfer the claim to a different agency.[5]
See P.B. 8, 14-15.  If Brown transferred a claim, he would prepare a standard transmittal form
and send the claim to the other agency, and would also send a copy of the transmittal form to the
claimant.  See P.B. at 4, 15-16.  Although Brown did not recall the claim and has no further
documentation relating to the claim,[6] after reviewing the claim at his deposition, Brown testified
that his practice would have been to prepare a standard transmittal form and transfer the claim to
the San Diego naval station because the claim pertained to conduct occurring in California.  See
DUMF No. 22(c), (d); PUMF No. 42.  Depending on his workload, Brown would have
forwarded the claim within one to ten days of receipt.  See DUMF No. 22(e); P.B. at 12-13.
Plaintiff never received any transmittal forms, and the Navy did not return the October 2002
claim to Plaintiff.  See P.B. at 187-188.  The Navy did not respond to inquiries regarding the
status of the claim, so Plaintiff's attorneys conducted an investigation and sent the claim to the
HHS on December 24, 2002.  See P.B. at 188-189.  HHS received the claim on December 27,
2002.  See PUMF No. 48.  It does not appear that the Navy ever transferred the claim to HHS

---

[5]Under Block 1 ("Submit To Appropriate Federal Agency"), Plaintiff identified "Naval Legal Service
Office, Med-Atlantic Division."  See D.B. at 147.  Under Block 8 ("Basis of Claim"), Plaintiff referenced an
attached document.  The attached document (which is D.B. at 149) for Block 8 stated:

Araceli Cervantes Ortiz was a 25 year old female receiving pre-natal care at Golden Valley Health Center.
Her regular obstetrician was Christopher Grover, M.D.  Her pre-natal course was reportedly unremarkable.  Then on
November 8, 2000, Ms. Ortiz had been admitted to Doctors Medical Center in Modesto, CA for her labor and
deliver of claimant Harry Ortiz.  During labor, the baby become [sic] tachycardic.  In response to the patient's
condition, another physician identified as Sylvia Diego, M.D. assumed the patient's care.  Dr. Diego delivered the
claimant utilizing a vacuum.  During the course of the delivery, the claimant's shoulder was caught in the birth canal.

Negligent pre-natal, labor, delivery and neo-natal care rendered by the medical personnel resulted in
injuries to the minor claimant Harry Ortiz set forth more fully herein below and related injuries to his parents.  The
health care providers had failed to screen, supervise, train and appropriately retain employees and agents.  They
failed to have proper policies and procedures and failed to follow their existing policies and procedures.  They failed
to fully investigate and obtain pre-employment qualifications for the persons responsible for the treatment of the
claimants.  They failed to provide proper and adequate pre-service training to assure knowledge and compliance of
the standards and requirements of the employees.  These health care providers failed to have policies, procedures and
guidelines and to force [sic] those policies, procedures, and guidelines for patient care.  They failed to follow all
statutory and special duties imposed on them by law.  They had breached the applicable standard of care.  These
health care providers were employers or actual and ostensible of the government entity.

[6]Brown testified that he keeps copies of such records for two years and then destroys them.  Brown's
deposition was taken in 2006, so any records regarding the October 2002 claim would have been destroyed in 2004.
See P.B. at 4, 10.

1    and, according to Brown, the San Diego naval office has no record of Plaintiff's claim.  See D.B.

2    at 124; P.B. at 9-11.  The Navy never returned Plaintiff's claim to Plaintiff or contacted

3    Plaintiff's attorneys.  See P.B. at 187; cf. P.B. at 9-10.

4         Additionally, around May 14, 2002, Plaintiff sent an intent to sue letter to Dr. Diego.  See

5    DUMF No. 20.  The letter was sent for Dr. Diego to one of Golden Valley Health Center's

6    ("GVHC") Modesto clinics.  See Defendant's Exhibit J at ¶ 4.  GVHC is considered a federal

7    employee.  See Defendant's Motion at 13 n.2; Defendant's Exhibit J at ¶ 2.  GVHC in turn sent

8    Plaintiff's attorneys a letter[7] that indicated that it was necessary to file an FTCA administrative

9    claim, and provided a pre-addressed FTCA claim form that had the proper HHS address.  See

10   DUMF No. 20;[8] Defendant's Exhibit J at ¶¶ 3, 5; December 11, 2006, Didier Declaration at

11   Exhibit 2.  The December 24, 2002, claim was sent to HHS at the same address that had

12   previously been provided to Plaintiff from GVHC.  See December 11, 2006, Didier Declaration

13   at Exhibit 2; P.B. at 205, 207.  Also, the December 2002 HHS claim indicated that Plaintiffs did

14   not know or have reason to know of Plaintiff's injury or its cause until September 2001 when

15   they consulted with attorneys.  See D.B. at132.

16        *Evidence Regarding Accrual of Plaintiff's Claim*

17        There are disputed facts in this case regarding what information may or may not have

18   been conveyed to the Ortizes regarding Plaintiff's brain injury/cerebral palsy and its cause.  The

19

20        [7]The letter reads: "I have received your letter of representation on behalf of Harry Ortiz and Araceli

21   Cervantes.  The enclosed Standard Form 95 needs to be completed and forwarded to the Office of General Counsel.
     If questions, call me at []."  December 11, 2006, Didier Declaration Exhibit 2.

22        [8]Plaintiff objects to DUMF No. 20 by stating, "Hearsay and no foundation laid for the subject document

23   and its contents."  First, the Court is not certain what part of the DUMF Plaintiff believes is hearsay.  If he means the
     letter from Plaintiff's counsel, that is not hearsay.  See Fed. R. Evid. 801(d)(2).  If Plaintiff means GVHC's letter

24   sent to Plaintiff's counsel, that letter shows knowledge by Plaintiff that HHS was the proper agency to whom to send
     the claim and thus, is not viewed for the truth of the matter asserted.  See Fed. R. Evid. 801(c); Federal Trade

25   Comm'n v. Amy Travel Service, Inc., 875 F.2d 564, 576 n.11 (7th Cir. 1989).  With respect to foundation,
     Rodriguez's declaration provides the foundation for the attached documents.  See Exhibit J.  The Court notes that

26   Defendant's Exhibit J did not include the two referenced documents (Plaintiff's intent to sue letter and GVHC's
     response), but Defendant did file these omitted exhibits accompanied by a declaration from its counsel.  See Court's

27   Docket Document No. 80.  The declaration was filed before this matter was taken under submission, and no further
     objections or an attempted sur-reply as to Document 80 have been made.  The objections are thus, overruled.

28                                    5

dispute centers around declarations filed by the Ortizes, a declaration by Dr. Grover, and deposition testimony from the Ortizes, Drs. Wang, Murphy, and Grover, and social worker Tracy Kempf.

> ### 1.       Deposition and Declaration by Araceli Ortiz

Mrs. Ortiz has filed a declaration that in relevant part states:

> 5.  I did not learn that my son or his shoulder had been stuck or that he was choked or that his brain was injured during delivery until sometime in 2001.

> 6.  During my son's stay in the hospital in November and December 2000, I did not speak to any of the doctors about my sons condition except Dr. Grover. Dr. Grover told me that my son would be ok.

> 7.  In the first two or three months of Harry's life, he looked like any normal infant to me except for some nipple feeding problem.  Because fo the nipple feeding problem, Harry was given a [g-tube] when he was about a month old.  My husband and I were told by Harry's doctors that the tube would probably be temporary.

> 8.  In January 2001, Dr. Sonia Lee . . . started caring for my son. Sometime in early 2001, it was either Dr. Lee or some other doctor who told me that Harry was suffering from cerebral palsy and had a permanent brain injury. This was the first time that anyone told me that Harry, in fact, had cerebral palsy or a brain injury.

> 10.  At no time before seeing Dr. Lee in 2001 did I know or think that any person had done something to cause or contribute to any injury to my son Harry.

> 11.  Sometime in 2001, my husband and I talked to an attorney about what the doctors like Dr. Lee had told us in early 2001.  After this, I learned for the first time that my son's injury was caused by the care that I received from the doctors during delivery.  I learned for the first time that the doctor had used a vacuum on [plaintiff's] head to pull him out of my body, that his should had gotten stuck and that he choked while his shoulder was stuck.

> 12.  At about the same time in the latter part of 2001, I also learned for the first time that the cause of my son's cerebral palsy and permanent brain injury was being stuck during delivery.

Araceli Ortiz Declaration at ¶¶ 5-8, 10-12.

In her deposition, Mrs. Ortiz stated that after delivery a doctor told her that Plaintiff was okay and that she should not worry, see Araceli Ortiz Deposition at 93:20-94:7 (P.B. at 66-67), that Dr. Grover did not discuss the delivery with her and only said that Plaintiff would be okay, see id. at 94:8-12 & 103:6-9 (P.B. at 67, 74), and that nurses and doctors would tell her husband

that Plaintiff was okay or was doing well. See id. at 97:11-20 (P.B. at 70). Mrs. Ortiz testified

that she did not have any discussions with health care providers as to the cause of Harry's

problems, see id. at 104:4-7, & 107:18-108:1 (P.B. at 75-76), and, other than the doctor who

came in after delivery to say that Plaintiff was okay, Mrs. Ortiz could not recall speaking to any

other doctors regarding Plaintiff while he was in the hospital. See id. at 96:16-19 (P.B. at 69).

    2.    Deposition and Declaration of Harry Ortiz, Sr.

Similar to his wife, Mr. Ortiz in part has declared:

    5.  I did no learn that my son or his should had been stuck or that he was choked or that his brain was being injured during delivery until sometime in 2001.

    6.  My son remained in the hospital for the next month and a half after his birth.  During that time, I talked with some doctors and other people who had been taking care of my son.  I was told by them during these talks that my son would probably be fine and to treat him as normal, and to take him to a pediatrician once he left the hospital.

    7.  In the first three or four months of Harry's life, I was not told by anyone that Harry had cerebral palsy or any brain injury.  In that time, I understood from neurologist Dr. Wang that he was not sure about Harry's future condition, but that Harry probably would be fine and we should wait and see what happens.

    10.  In January 2001, Dr. Sonia Lee, a pediatrician, started caring for my son.  Sometime in early 2001, Dr. Lee told me that Harry was suffering from cerebral palsy and had a permanent brain injury.  This was the first time that anyone told me that Harry, in fact, had cerebral palsy or a brain injury.

    12.  At no time before seeing Dr. Lee in 2001 did I know or think that any person had done something to cause or contribute to any injury to my son Harry.

    13.  Sometime in 2001, I talked to an attorney about what the doctors like Dr. Lee had told us in early 2001.  After this, I learned for the first time that my son's injury was caused by the care that my wife received from the doctors during delivery.  I learned for the first time that the doctor had used a vacuum on [plaintiff's] head to pull him out of my wife's body, that his should had gotten stuck and that he choked while his shoulder was stuck.

    14.  At about the same time in the latter part of 2001, I also learned for the first time that the cause of my son's cerebral palsy and permanent brain injury was being stuck during delivery.

Harry Ortiz, Sr. Declaration at ¶¶ 5-7, 10, 12-14.

    Additionally, Mr. Ortiz testified that, at some time, Dr. Wang told him that Plaintiff was

fine and that he should treat his son like a jewel. See Deposition of Harry Ortiz, Sr. at 77:12-17

7

(P.B. at 113).  Mr. Ortiz did not know of or recall Dr. Wang ever telling him that Plaintiff had

any kind of injury.  See id. at 78:10-12 (P.B. at 114).

       3.     Declaration and Deposition of Dr. Christopher Grover

Dr. Grover has filed a declaration that states in part:

      3.  As I was Ms. Ortiz's physician of record, I immediately learned that her
delivery had been complicated by the unexpected occurrence of shoulder dystocia
and that her baby had a poor prognosis.  I was aware that the baby was showing
signs of hypoxic ischemic encephalopathy ("HIE").  HIE occurs when there is a
lack of oxygen and blood flow to the brain, and it results in permanent brain
damage.

      4.  When I stopped in on my hospital rounds on November 10, 2000, to
examine Ms. Ortiz, I also spoke with her and her husband about their son's
medical condition and poor status.  We discussed the baby's poor prognosis quite
extensively and I conveyed to them that the baby's injuries were due to the
difficulties during birth.  I specifically recall telling them his shoulder had gotten
stuck during birth and I recall that Ms. Ortiz said that she felt guilty for her son's
outcome because she had not pushed hard enough.  The Ortizes demonstrated
their understanding of what I was saying through their sad affects and appropriate
questions to me.

      5.  . . . I noted [in Mrs. Ortiz's chart] that I discussed the baby's medical
status with his parents.  This entry was made on November 10, 2000, shortly after
I finished talking with [them].

      6.  On November 12, 2000, after talking with Dr. Fred Murphy . . . about
what kind of prognosis I could convey to the Ortizes, I had another discussion
with the parents about their baby.  During this visit, Mr. Ortiz asked me in English
about the chance of his sone being "normal."  I told him and his wife that there
might be up to a 50% chance that their son could recover from his injury and
eventually live a normal life.  I explained that although the baby's brain and major
organs had been damaged, infants' brains can recover from major injuries.  I told
them that it would become apparent with time whether or not their baby would be
able to talk and walk normally.

      7.  At the end of our conversation, I asked the Ortizes whether they
understood what I had told them, and they said that they did.  As before, they were
very sad, which I took as further confirmation that they understood what I was
telling them.  As I recall, this meeting lasted about 15-20 minutes. [Attached is a
copy] of the note I entered into Ms. Ortiz's chart to document the above
conversation.  This note was written immediately after I finished talking with the
Ortizes and says, "Discussed 50-50 prognosis for baby."

Grover Declaration at ¶¶ 3-7 (D.B. at 66-67).

Dr. Grover testified at his deposition that he talked about the prognosis of Plaintiff, that

Plaintiff's shoulder had gotten stuck, that Mrs. Ortiz felt guilty for not pushing hard enough, and

8

that there was a 50/50 chance for recovery or permanent brain damage.[9]  Grover Deposition at

27:14-29-15 (D.B. at 35).  Additionally, Dr. Grover testified that he documented these

discussions in the hospital records.  See id. at 29:17-25 (D.B. at 37).  Plaintiff's counsel indicated

that he had the hospital records and requested that Dr. Grover turn to the particular pages.  See id.

at 30:7-10 (D.B. at 38).  Dr. Grover then testified that contained in the progress report section of

Mrs. Ortiz's medical chart from Doctor's Medical Center was the following: "11-10, it's the next

page, 'Discussed baby with patient and husband's questions and given manual extraction.  Will

give antibiotics 24 hours.'  And the next day 11-11, maybe it was the last day, sorry.  11-12,

'Discussed 50/50 prognosis for baby.  Instruct to be sent home.'"  See id. at 30:10-15.

4.      Deposition of Neonatologist Dr. Frederick Murphy

Dr. Murphy testified that he has no independent recollection of Plaintiff or conversations

with Plaintiff's parents.  Relying on medical records, Dr. Murphy indicated that he examined

Plaintiff on November 10, 2000, and at that time formed the impression that plaintiff "had

encephalopathy and that the encephalopathy was due to an hypoxic ischemic event," which

means "that for a period of time prior to delivery or at delivery he had inadequate oxygen

delivery or blood supply to the brain."  Murphy Deposition at 13:12-19 (P.B. at 35).  Dr. Murphy

testified that many things can cause encephalopathy and, in Plaintiff's case, he would not have

speculated whether Plaintiff's condition would get better quickly or have some long term

sequelae.  Id. at 14:11-15:25 (P.B. at 36-37).  Dr. Murphy spoke with Plaintiff's father on several

occasions between November 10 and 13, 2000.  See D.B. at 73-79.  Although Dr. Murphy has no

independent recollection of these early meetings, he testified that his custom and habit was to

discuss with the parents:  (1) the child's condition; (2) each of the child's problems; (3) the plan

of treatment; and (4) expected outcome.  See Murphy Deposition at 20:17-21:21 (D.B. at 82-83).

With respect to neurological conditions in a patient like Plaintiff, Dr. Murphy testified that his

[9]Although Dr. Grover used the term "brain damage," Dr. Murphy testified that he does not use the term
"damage" but instead uses the term "injury" because "injury" has the connotation of being something that can heal.
See Murphy Deposition at 46:20-47:17 (P.B. at 48-49).

custom and practice would have been to discuss that (1) the infant was neurologically depressed; (2) seizures and other evidence of hypoxic ischemic injury; (3) that the heart, kidneys, liver and brain were affected;[10] (4) and that the particular organs are not working normally because they did not get enough oxygen delivery or blood delivery and the organs were injured.  See id. at 22:16-23:13 (D.B. at 84-85).  Dr. Murphy testified that he was certain he told Plaintiff's father the above information because of notations in the medical records.  See id. at 21:6-9 (D.B. at 83).  Significantly, Dr. Murphy testified: "I again am certain that I told them that along the organs that were injured was the brain and that the reason the baby wasn't breathing normally and was having seizures and was neurologically depressed and in a state of coma, that it was due to decreased blood flow, decreased oxygen delivery to the brain occurring prior to or around the time of delivery."  See id. at 23:17-23 (D.B. at 85).[11]  Dr. Murphy also testified that at some point he would have told Plaintiff's parents that Plaintiff was at significant risk of cerebral palsy, meaning that there was a 20% chance of cerebral palsy and an 80% chance that Plaintiff was not going to have cerebral palsy, but he has no recollection whether he told the Ortizes these percentages.  See id. at 44:20-45:13 (P.B. at 46-47).  Dr. Murphy never made a diagnosis that Plaintiff had cerebral palsy.  See id. at 26:1-3 (P.B. at 40).  Progress notes by Dr. Murphy under the "social and communication section" on November 11 and 13, respectively, state: "I spoke with the father of this infant yesterday and I will meet with him again today and discuss the new problems and plans," see D.B. at 75, and "I have spoken to the father of this infant at length.  He seems to have a fair understanding of the current problems and plans."  See D.B. at 79.

     5.    Deposition of Pediatric Neurologist Dr. Lawrence Wang

     Like Dr. Murphy, Dr. Wang has no independent recollection of Plaintiff or conversations

---

[10]Dr. Murphy later testified that Plaintiff's liver and kidneys had completely healed.  See Murphy Deposition 46:13-47:17 (P.B. at 48-49).

[11]Although not cited by the parties, in response to questions about what he would have said to the Ortizes about how the events during labor and delivery contributed to the outcome, Dr. Murphy said: "I'm certain the only thing I said to them was that there was a period of time either prior to delivery, around the time of delivery when the baby didn't get enough oxygen or blood flow to the brain.  And that's it."  Murphy Deposition at 58:12-20.

10

with Plaintiff's parents.  Dr. Wang testified that, as per the medical records, he met with Mr.

Ortiz on November 9, 2000, and discussed Plaintiff's neurological condition.  See Wang

Deposition at 12:25-13:10 (D.B. at 54).  Dr. Wang testified that his custom and practice in 2000

would be to indicate to the parents that "there was an injury or insult to the brain, and the

seriousness of this injury, how we are trying to support the baby because the baby is critically ill,

that we don't know what the long term outcome will be, but we do know that the baby did

sustain some type of brain injury, and that time will tell with more certainty what the long-term

outcome will be."  Id. at 14:15-25 (D.B. at 54).  Dr. Wang also testified that on the first day the

neurological situation will fluctuate, that the long term outcome will be easier to judge once the

situation stabilizes, and that parents are typically told that the medical staff is just trying to

stabilize the situation and that the long term outcome is unknown.  See id. at 15:1-17.(D.B. at 54;

P.B. at 179).  Dr. Wang met again with the Ortizes on November 27, 2000, by which time Dr.

Wang felt that Plaintiff's condition had stabilized.  See id. at 28:11-29:2 (D.B. at 57).  Dr. Wang

testified that, with a child at 19 days of age whose neurological exam was still abnormal, still

having feeding problems, and an abnormal MRI brain scan consistent with a hypoxic ischemic

encephalopathy, his custom and practice was to advise the parents of the likelihood of long-term

neurologic sequelae.  Id. at 29:16-22.  With a child like Plaintiff, Dr. Wang's custom and practice

was to tell the parents that, *inter alia*, the child will require long-term neurologic follow up with

a pediatrician, but that he did not know how long the special needs of the child will last but that

with time it would be more clear.  See id. at 29:23-31:11.  Dr. Wang explained that when he

noted in the medical records on November 27, 2000, that he "spoke with the parents about

[Plaintiff's] neurological status and likelihood of long-term neurological sequelae," he meant that

he told the parents that he did not anticipate that Plaintiff would recover because he used the

word "likelihood" instead of "possibility."  Id. at 35:19-36:4 (P.B. at 180-181).  By "long term,"

Dr. Wang was not being specific and was going by days and weeks rather than thinking years and

decades, but nevertheless indicated that this would be a process "of some duration."  Id. at 59:20-

60:11 (P.B. at 184).[12]  Dr. Wang does not recall telling the Ortizes that Plaintiff's condition

would be permanent because there were still a lot of uncertainties, even at the last time he saw

Plaintiff, and the notes in the medical records do not reflect that he told the Ortizes the cause of

Plaintiff's neurological condition.  See id. at 52:5-25, 54:3-16 (P.B. at 183).

        6.      Deposition of Social Worker Tracy Kempf

        Tracy Kempf was the social worker who met with the Ortizes while Plaintiff was in the

NICU.  Kempf explained that her responsibilities were to meet with parents whose babies are in

the NICU for support and provision of resources and to ensure that communication is occurring

between the parents and the doctors and nurses.  See Kempf Deposition 11:7-12:22 (D.B. at 90-

91).  Kempf had no independent recollection of Plaintiff or conversations with the Ortizes, but

testified regarding notes that she made on the day of meetings with them.  See id. at 20:24-21:9

(D.B. at 95-96).  Kempf's notes for the first meeting with the Ortizes (November 15, 2000),

indicated that the parents were "worried" and "seem to have a basic comprehension of the

concerns."  Id. at 19:22-21:15 (D.B. at 94-96).  Kempf testified that notes meant that the parents

used the word "worried" and that they "were able to verbalize . . . what the physician had said to

them about the baby's status."  Id.  Kempf testified that notes for November 22 indicated that the

parents were able to verbalize their understanding of their conversations with Plaintiff's

physicians.  See id. at 22:18-23:11 (D.B. at 97-98).  However, neither Kempf nor her notes for

November 15 or 22 indicate what precisely the physicians told the parents or precisely what the

parents told Kempf about what the physicians were telling them about Plaintiff.  On November

29, 2000, the Ortizes and Kempf talked about, inter alia, a discussion that the Ortizes had with

Dr. Wang on November 27.  The notes for the November 29 meeting state that the Mr. Ortiz

"expresses much sadness and concern over how his son is doing, becomes tearful when relating

his concerns about [Plaintiff's] outcome – the couple exhibit a basic understanding that their

---

[12]Plaintiff's Evidence 184 begins with page 60 of Dr. Wang's deposition.  However, Defendant lodged the entire deposition of Dr. Wang (as well as Drs. Murphy, Diego, and Grover, Ms. Kempf, Mr. Ortiz, Mr. Brown, and Sheila Lee), which includes page 59.

1  sone will have long-term developmental concerns and show their sadness over this outcome."

2  D.B. at 112.  Kempf testified that her notes for November 29 were a true and correct reflection of

3  what took place during that meeting.  See Kempf Deposition at 32:19-23 (D.B. at 101).

4

5  **LEGAL STANDARDS**

6  *1.*     *Rule 12(b)(1)*

7        Rule 12(b)(1) of the Federal Rules of Civil Procedure allows for a motion to dismiss

8  based on lack of subject matter jurisdiction.  See Fed. R. Civ. Pro. 12(b)(1).  It is a fundamental

9  precept that federal courts are courts of limited jurisdiction.  Vacek v. UPS, 447 F.3d 1248, 1250

10  (9th Cir. 2006).  Limits upon federal jurisdiction must not be disregarded or evaded.  Owen

11  Equipment & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978).  The plaintiff has the burden to

12  establish that subject matter jurisdiction is proper.  Kokkonen v. Guardian Life Ins. Co., 511 U.S.

13  375, 377 (1994); Vacek, 447 F.3d at 1250; In re Ford Motor Co., 264 F.3d 952, 957 (9th Cir.

14  2001).  A Rule 12(b)(1) motion may be either facial, where the inquiry is confined to the

15  allegations in the complaint, or factual, where the court is permitted to look beyond the complaint

16  to extrinsic evidence.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004); Savage v.

17  Glendale Union High School Dist. No. 205, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

18        When a defendant makes a factual challenge "by presenting affidavits or other evidence

19  properly brought before the court, the party opposing the motion must furnish affidavits or other

20  evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  Safe Air For

21  Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004); Savage, 343 F.3d at 1039 n.2.  The

22  court need not presume the truthfulness of the plaintiff's allegations under a factual attack.

23  White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).  Where the jurisdictional issue and the merits

24  of the case are not factually completely intermeshed or intertwined, the court may consider the

25  evidence presented with respect to the jurisdictional issue and rule on that issue, including

26  resolving factual disputes when necessary.  St. Clair v. Chico, 880 F.2d 199, 201-02 (9th Cir.

27  1989); Rosales v. United States, 824 F.2d 799, 803 (9th Cir. 1987); Thornhill Publishing Co. v.

28                                          13

1  General Telephone Electronics, 594 F.2d 730, 733 (9th Cir. 1979); Berardinelli v. Castle &

2  Cooke, Inc., 587 F.2d 37, 38-39 (9th Cir. 1978); 5B Wright & Miller, Federal Practice and

3  Procedure: Civil 3d § 1350 (2004); see also T.L. v. United States, 443 F.3d 956, 961 (8th Cir.

4  2006).  Jurisdiction and the merits of a case are intertwined when the same statute provides the

5  basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive

6  claim for relief, Safe Air, 373 F.3d at 1039-40, or when the question of jurisdiction is dependent

7  on decision of the merits.  St. Clair, 880 F.2d at 201; Berardinelli, 587 F.2d at 733.  When the

8  jurisdictional issue is completely intermeshed or intertwined with the merits of the case, the

9  district court "should employ the standard applicable to a motion for summary judgment and

10  grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not

11  in dispute and the moving party is entitled to prevail as a matter of law. [Unless this standard is

12  met], the intertwined jurisdictional facts must be resolved at trial by the trier of fact."  Rosales,

13  824 F.2d at 803; Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1981).

14  <u>2.</u>        <u>Federal Tort Claims Act Statute of Limitations for Medical Malpractice</u>

15         The FTCA bars any tort claim against the United States unless it is presented in writing

16  to the appropriate federal agency within two years after such claim accrues.  28 U.S.C. §§

17  2401(b), 2675(a); Winter v. United States, 244 F.3d 1088, 1090 (9th Cir. 2001); Outman v.

18  United States, 890 F.2d 1050, 1052 (9th Cir. 1989).  This limitation is a threshold jurisdictional

19  requirement and the failure to follow it deprives a court of jurisdiction.  See McGraw v. United

20  States, 281 F.3d 997, 1001 (9th Cir. 2002), amended by 298 F.3d 754 (9th Cir. 2002); Landreth v

21  United States, 850 F.2d 532, 533 (9th Cir 1988); Augustine, 704 F.2d at 1077.

22         A medical malpractice claim under the FTCA accrues when the plaintiff discovers, or in

23  the exercise of reasonable diligence should have discovered, the injury and its cause.  United

24  States v. Kubrick, 444 U.S. 111, 120 (1979); Landreth, 850 F.2d at 532; Colleen v. United States,

25  843 F.2d 329, 331 (9th Cir. 1987); Davis v. United States, 642 F.2d 328, 331 (9th Cir. 1981).

26  The "should have known" standard "looks not to the likelihood that a plaintiff would in fact have

27  discovered the cause of his injury if he had only inquired, but instead focuses on whether the

28                                          14

plaintiff could reasonably have been expected to make the inquiry in the first place." <u>Rosales</u>, 824 F.2d at 804.  A cause is known when the immediate physical cause of the injury is discovered.  <u>Outman</u>, 890 F.2d at 1052; <u>Davis</u>, 642 F.2d at 331.  Knowledge of the immediate physical cause does not require knowledge of legal fault or negligence.  <u>See Kubrick</u>, 444 U.S. at 123-25; <u>Winter</u>, 244 F.3d at 1090; <u>Rosales</u>, 824 F.2d at 805; <u>Davis</u>, 642 F.2d at 330-31.  Further, "a claim does not wait to accrue until a party knows the precise extent of an injury." <u>United States v. Raddatz</u>, 750 F.2d 791, 796 (9th Cir. 1984); <u>Ashley v. United States</u>, 413 F.2d 490, 493 (9th Cir. 1969); <u>see also T.L.</u>, 443 F.3d at 962.  Although knowledge of an injury and who inflicted the injury will generally begin the duty to investigate and thus, begin the accrual of a claim, <u>see Kubrick</u>, 444 U.S. at 122; <u>Raddatz</u>, 750 F.2d at 795-96, a claim may also accrue where a plaintiff has knowledge of an injury and knowledge of the "medical cause" of the injury.  <u>See Winter</u>, 244 F.3d at 1092; <u>Herrera-Diaz v. United States</u>, 845 F.2d 1534, 1537 (9th Cir. 1988).  However, a medical malpractice cause of action "does not accrue . . . when a plaintiff has relied on statements of medical professionals with respect to his or her injuries and their probable causes." <u>Winter</u>, 244 F3d at 1090; <u>see also Colleen</u>, 843 F.2d at 331; <u>Rosales</u>, 824 F.2d at 804-05; <u>Raddatz</u>, 750 F.2d at 796.

Additionally, the two year time limitation for filing an FTCA claim is not tolled during a claimant's minority.  <u>Papa v. United States</u>, 281 F.3d 1004, 1011 (9th Cir. 2002); <u>Landreth</u>, 850 F.2d at 534; <u>United States v. Brown</u>, 353 F.2d 578, 579 (9th Cir. 1965).  Any knowledge a minor's parents have of the minor's injuries and the cause of those injuries is imputed to the minor.  <u>Zavala v. United States</u>, 876 F.2d 780, 782 (9th Cir. 1989); <u>Landreth</u>, 850 F.2d at 534; <u>Fernandez v. United States</u>, 673 F.2d 269, 271 (9th Cir. 1982).  "The minor's parents have a legal duty to take action on the child's behalf." <u>Landreth</u>, 850 F.2d at 534.

*3.      Constructive Filing under 28 C.F.R. § 14.2(b)(1)*

Although it is a jurisdictional requirement for a claimant to file an administrative claim with the appropriate agency within two-years of accrual, <u>see McGraw</u>, 281 F.3d at 1001, under certain limited circumstances, a claim filed with the wrong agency may nevertheless be

15

considered constructively filed with the appropriate agency.  See Bukala v. United States, 854

F.2d 201, 203-04 (7th Cir. 1988).  The Department of Justice has established the following

administrative guideline with respect to FTCA claims:

> A claim shall be presented to the Federal agency whose activities gave rise to the
> claim. When a claim is presented to any other Federal agency, that agency shall
> transfer it forthwith to the appropriate agency, if the proper agency can be
> identified from the claim, and advise the claimant of the transfer. If transfer is not
> feasible the claim shall be returned to the claimant. The fact of transfer shall not,
> in itself, preclude further transfer, return of the claim to the claimant or other
> appropriate disposition of the claim. A claim shall be presented as required by 28
> U.S.C. 2401(b) as of the date it is received by the appropriate agency.

28 C.F.R. § 14.2(b)(1).  Courts have interpreted 28 C.F.R. § 14.2(b)(1) as imposing affirmative

duties upon federal agencies who receive FTCA claims, but who are not the agency whose

activities gave rise to the claim.  See Hart v. Department of Labor ex rel. United States, 116 F.3d

1338, 1340 (10th Cir. 1997); Greene v. United States, 872 F.2d 236, 236-37 (8th Cir. 1989);

Bukala, 854 F.2d 201, 203-04 (7th Cir. 1988); see also Kanar v. United States, 118 F.3d 527, 531

(7th Cir. 1997).  Such agencies "in a dutiful and timely fashion" are to either transfer the claim to

the appropriate agency if the agency can be identified from the claim or return the claim to the

claimant if transfer is not feasible.  See 28 C.F.R. § 14.2(b)(1); Hart, 116 F.3d at 1340-41;

Bukala, 854 F.2d at 204.  "Where one agency of government attempts in a dutiful and timely

fashion to transfer a misdelivered claim to the appropriate federal agency and despite due

diligence the claim arrives at the proper agency after the two year limitations period has run, the

claim will be time-barred."  Bukala, 854 F.2d at 204; Oquendo-Ayala v. United States, 30

F.Supp.2d 193, 195-96 (D. P.R. 1998); see Hart, 116 F.3d at 1340.  In contrast, when an

"inappropriate agency" fails in its duty to promptly comply with § 14.2(b)(1), and, as a result, a

timely filed, but misdirected claim does not reach the proper agency within the limitations period,

the claim may be considered timely filed.  Hart, 116 F.3d at 1341; Greene, 872 F.2d at 237;

Bukala, 854 F.2d at 204.  However, claimants who wait to the last minute or the eleventh hour

and file with the wrong agency cannot take advantage of constructive filing.  See Hart, 116 F.3d

at 1341; Bukala, 854 F.2d at 204 n.4; Cronauer v. United States, 394 F.Supp.2d 93, 100 (D. D.C.

2005); Oquendo-Ayala, 30 F.Supp.2d at195-96; Johnson v. United States, 906 F.Supp. 1100,

1108 (S.D. W. Va. 1995); Lotrionte v. United States, 560 F.Supp. 41, 43 (S.D. N.Y. 1983).  No

court has established a bright line rule for what constitutes "the last minute" or "the eleventh

hour."  Courts have held that claims filed with an inappropriate agency approximately eight

months, see Bukala v. United States, 727 F.Supp. 382, 384-85 (N.D. Ill. 1989), nine-weeks, see

Greene, 872 F.2d at 236-37, and seven weeks, see Blair v. United States, 1990 U.S. Dist. LEXIS

10042, *3, *16 (D. Kan. 1990), prior to the expiration of the limitations period were

constructively filed, and therefore timely.[13]  Courts have held that claims filed with an

inappropriate agency on the final day, see Cronauer, 394 F.Supp.2d at 100-01, one day, see

Johnson, 906 F.Supp. at 1100, three days, see Lotrionte, 560 F.Supp. at 42-43, eight days, see

Oquendo-Ayala, 30 F.Supp.2d at 195-96, and eighteen days, see Massengale v. United States,

2006 U.S. Dist. LEXIS 81971, *1-*2, *7 (D.D.C. 2006), prior to the expiration of the limitations

period were filed at the "last minute" or "eleventh hour" and therefore were time barred.


**DISCUSSION**

1.      **Method Of Review – Rule 12(b)(1) or Rule 56**

The framework with which to review this motion is dependent upon whether the

jurisdictional issue is completely intertwined or intermeshed with the merits of the case.  Plaintiff

relies primarily on *Augustine* and *McGraw* to argue that the jurisdictional issues are so

intertwined that the Rule 56 summary judgment framework must be applied.  Defendant argues

that the jurisdictional issue is separate from the merits of the case and that the general Rule

12(b)(1) factual attack framework applies.  Based on the arguments presented, the Court agrees

with the Defendant.

Plaintiff's claim is based on affirmative acts of negligence by Dr. Diego.  That is, Dr.

Diego's use of a vacuum during delivery caused shoulder dystocia, which caused Plaintiff to be

---

[13]Of course, in each of these cases the agency failed to dutifully and timely transfer or return the claim.

1   asphyxiated for an appreciable period of time, which then lead to various injuries, including brain

2   injury/cerebral palsy.  There appears to be no dispute regarding causation, i.e. Plaintiff suffered

3   brain damage because he was being asphyxiated.  See PUMF No. 9 ("According to the

4   defendant's expert, during that five or more minutes, Harry's neck was being choked by his

5   mother's vagina thereby causing permanent brain damage.").  Thus, the merits of the case seem

6   to be dependent on liability and the valuation of damages.  The value of damages is not a

7   jurisdictional concern.  Liability is dependent upon whether Dr. Diego breached the standard of

8   care through her use of the vacuum or possibly her conduct once it was determined that Plaintiff

9   was stuck.  This liability issue is separate from whether the Ortizes either knew or reasonably

10  should have known that Plaintiff was injured and the cause of his injury.  In other words, a

11  determination of when the Plaintiff's parents knew or should have known of both the Plaintiff's

12  brain injury and the injury's cause has no bearing on whether Dr. Diego's use of the vacuum

13  device during Plaintiff's delivery breached the standard of care.

14       Cases like _Augustine_ and _McGraw_ involve a failure to diagnose, treat or warn an existing

15  condition.  See McGraw, 281 F.3d at 1003-04; Augustine, 704 F.2d at 1078.  The injury in such

16  failure to diagnose, treat or warn cases is the development of a "problem into a more serious

17  condition which poses greater danger to the patient or which requires more extensive treatment."

18  Augustine, 704 F.2d at 1078; see McGraw, 281 F.3d at 1002.  With respect to the jurisdictional

19  issue of accrual, the _Augustine_ court explained:

20       [A]ccrual depends upon when and if plaintiff discovered or through the exercise
         of reasonable diligence should have discovered that the failure of his doctors to
21       diagnose, treat, or warn him led to his deteriorating physical condition.  That, in
         turn, depends upon whether the attending dentists properly diagnosed Augustine's
22       condition and adequately informed him of the need to obtain prompt supplemental
         care, issues which go to the heart of the Augustine's negligence action under the
23       FTCA

24  Augustine, 704 F.2d at 1078; cf. McGraw, 281 F.3d at 1001-03 (clarifying that "an FTCA

25  plaintiff asserting a failure-to-diagnose claim must know or have reason to know of a pre-

26  existing condition before the accrual clock begins to run.").

27       Here, this case does not involve the development of a pre-existing condition into a more

28                                          18

1   serious condition due to a failure to diagnose, treat, or warn, i.e. this is not a failure to diagnose

2   case.  Cf. McGraw, 281 F.3d at 1001.  The negligence in this case is affirmative conduct that

3   created a new injury and did not aggravate an existing one.  What the Ortizes were told about

4   Plaintiff's condition goes to the jurisdictional accrual issue, but has nothing to do with whether

5   Dr. Diego breached the standard of care through her use of a vacuum.  The mere fact that this is

6   an FTCA medical malpractice case does not mean that the jurisdictional accrual issue is

7   intertwined with the merits of the medical malpractice case.  Cf. Rosales, 824 F.2d at 803 & n.4

8   (assuming that jurisdictional and merit issues were not intertwined).  Because a determination of

9   when Plaintiff's parents knew, or in the exercise of reasonable diligence should have known, of

10  Plaintiff's injury and its cause is not intertwined with the issue of whether Dr. Diego's conduct

11  regarding the vacuum was negligent, the Court will resolve this motion under the framework for

12  a Rule 12(b)(1) factual attack.  Because Rule 12(b)(1) and not Rule 56 set the framework for

13  resolution of the motion, the mere presence of a factual dispute between the parties on a

14  jurisdictional issue will not cause the denial of Defendant's motion.  See T.L., 443 F.3d at 961;

15  Berardinelli, 587 F.2d at 38-39.

16      **2.      Date of Accrual**

17      Plaintiff argues that the testimony and declarations of his parents and the testimony from

18  Dr. Wang and Dr. Murphy show that the Ortizes were told that there were many uncertainties,

19  that doctors and nurses told the Ortizes that Plaintiff was okay, they were never told that there

20  was a brain injury or a permanent injury until 2001, were not aware that Plaintiff suffered a

21  permanent injury until after Plaintiff was discharged, and did not know that Dr. Diego's use of

22  the vacuum device had caused the injury until 2001.  According to Plaintiff this shows accrual

23  beginning in 2001 or at least disputed issues of fact.  Defendant argues that the depositions and

24  declarations of the health care providers, Mr. Ortiz's presence at the birth, and the length of stay

25  combine to show that this claim accrued shortly after birth, but no later than November 11, 2000.

26      The Court does not find the declarations of Mr. and Mrs. Ortiz to be persuasive.  For the

27  Court to find that Plaintiff's parents did not know, or should not have known, of Plaintiff's brain

28                                           19

injury and its causes prior to 2001, the Court would have to find that:  no physician during an approximately six week hospitalization ever told Plaintiff's parents that Plaintiff had sustained a brain injury, even though he was under the regular care of a pediatric neurologist; that Dr. Grover's deposition and declaration are not true; that two other treating physicians, Dr. Wang and Dr. Murphy (who are not defendants in this action), failed to follow their customs and practices; that Dr. Murphy's certainty as to what he told Plaintiff's parents is unpersuasive; that the medical record notations are inaccurate and do not mean what their authors (Drs. Grover, Murphy, and Wang) say they mean; and that Ms. Kempf's notes (particularly the notes of November 29, 2000)[14] are inaccurate.[15]  Although Plaintiff's parents may have limited English fluency, Drs. Wang and Murphy utilized interpreters, see Murphy Deposition at 23:24-24:11 (D.B. at 23-34); Wang Deposition at 13:5-10, 15:22-16:5 (D.B. at 54-55, 64), and Dr. Grover's declaration indicates that he regularly communicates in Spanish with his patients and had an interpreter with him for the November 12, 2000, discussion.  See D.B. at 67.  The Court cannot find that the Ortizes were aware of Plaintiff's brain injury and its cause only as of 2001.

The Court does find that the Ortizes did not discover that Plaintiff had cerebral palsy until sometime in 2001; Dr. Murphy warned of cerebral palsy but never made the diagnosis, see Murphy Deposition at 26:1-3 (P.B. at 40), and there is no evidence that any doctor diagnosed cerebral palsy until 2001.  However, the Eighth Circuit has recently held, "The accrual of a claim based on brain injury at birth is not tolled merely because the injury worsens and develops into cerebral palsy."  T.L., 443 F.3d at 962.  Thus, standing alone, the later diagnosis of cerebral palsy will not affect the accrual date where a plaintiff knows of a brain injury and that injury's cause

---

[14]Plaintiffs object to Kempf's notes as hearsay and without foundation, and to her explanatory testimony regarding those notes.  Again, the Court is viewing these notes primarily to establish knowledge.  Further, Kempf identified the notes as those she had taken at the meetings, stated that they were made the day of the meetings, and that they accurately reflected what occurred.  See Kempf Deposition at 8:3-11, 19:22-21:9, 32:16-22 (D.B. 94-96, 101).  To the extent that the Court relies on testimony or notes by Kempf in resolving the motion, Plaintiff's objections will be overruled.

[15]Also, upon discharge, Mrs. Ortiz knew that Plaintiff was supposed to see a "head doctor."  See Araceli Deposition at 101:18-102:3 (P.B. at 72-73).

prior to diagnosis of cerebral palsy.  See id.

The Court finds that Plaintiff's parents either knew or should have known that Plaintiff sustained a brain injury and that the brain injury was due to a lack of blood or oxygen flow that occurred around delivery on November 13, 2000.[16]  The Court finds that on November 9, 2000, Dr. Wang told Plaintiff's father that Plaintiff had sustained a brain injury, but that the extent of the injury was unknown because the situation was not stable.  See Wang Deposition at 13:8-14:25 (D.B. at 54).[17]  The Court finds that on November 10, 2000, Dr. Grover talked to the Ortizes about Plaintiff's "poor prognosis"[18] and told Plaintiff's parents that Plaintiff's shoulder had gotten stuck during delivery.  See D.B. at 35-38, 66-67.[19]  The Court also finds that on

_____

[16]Defendant's argument that Plaintiff's parents knew or should have known of Plaintiff's brain injury and its cause on November 8, 2000, is unrealistic.  Plaintiff was born at 11:05 p.m.  Although Plaintiff's father on November 8, 2000, knew that Plaintiff required resuscitation, there is no evidence that Plaintiff's father was told anything about brain injuries or that Plaintiff's injuries were hypoxic ischemic on that date.

[17]Plaintiff's object that an insufficient foundation has been laid regarding Dr. Wang's custom and practice.  Dr. Wang's deposition does not state how often he encountered situations similar to Plaintiff (unlike Dr. Murphy's deposition), although most of the questions relate to Dr. Wang's custom and practice as of November and December 2000.  Dr. Wang's c.v. (which is exhibit 1 of Dr. Wang's deposition and which was lodged with the Court) indicates that he practiced at Doctor's Medical Center from 1994 to 2002, that he was certified by the American Board of Psychiatry and Neurology with special qualification in child neurology, in 1995 and 2004, and was certified by the American Board of Pediatrics in 1989 and 1997.  Additionally, Plaintiff also relies on Dr. Wang's custom and practice for the proposition that Dr. Wang said that there were many uncertainties, that the staff was trying to stabilize the situation, and that more could be determined once the situations stabilizes over time.  See Plaintiff's Response to DUMF No. 5(b).  Sustaining Plaintiff's objection would prohibit both parties from using evidence concerning what Dr. Wang customarily tells patients.  Additionally, Dr. Wang's testimony is not dispositive since it does not appear that Dr. Wang told the Ortizes about the causes of Plaintiff's brain injury.  Both Dr. Grover and Dr. Murphy told the Ortizes that Plaintiff had sustained a brain injury and Dr. Murphy told the Ortizes the cause.  Given that Plaintiff also relies on Dr. Wang's custom and practice, and since other physicians told the Ortizes that Plaintiff suffered a brain injury, the Court will overrule the objection.

[18]The Court makes no finding whether Plaintiff had a poor prognosis, rather, the Court finds that Dr. Grover told Plaintiff's parents that Plaintiff had a poor prognosis.

[19]Plaintiff levels multiple objections against Dr. Grover's declaration: lack of foundation or lack of personal knowledge, hearsay, and improper expert testimony.  These objections lack merit.  The declaration states that it is made on personal knowledge and, as Mrs. Ortiz's physician, he would clearly have knowledge or obtained knowledge of the events surrounding the delivery.  See Sea-Land Serv. v. Lozen, Int'l, L.L.C., 285 F.3d 808, 819 (9th Cir. 2002); Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990).  With respect to the medical notes, Dr. Grover would know his own notes and at Dr. Grover's deposition, Plaintiff's counsel stated that he had a copy of the medical records and Dr. Grover explained the meaning of his notes in the medical records, which was consistent with the explanation of medical notes in his declaration.  With respect to hearsay, the Court is mostly viewing this declaration as to the issue of the Ortiz's knowledge.  See Amy Travel, 875 F.2d at 576 n.11.  To

1   November 12, 2000, Dr. Grover told the Ortizes that Plaintiff's major organs and brain had been

2   damaged,[20] and that there was a 50/50 chance that Plaintiff could recover.[21]   See D.B. at 36-38,

3   67.   The Court finds that between November 10 and 13, 2000, Dr. Murphy spoke with Mr. Ortiz.

4   Based on Dr. Murphy's custom and practice, he reviewed the condition, treatment plan, and

5   expected outcome with Mr. Ortiz.[22]   See Murphy Deposition at 21:11-23:23 (D.B. at 83-85).   The

6   Court finds that Dr. Murphy told Mr. Ortiz that Plaintiff's brain was injured and that the injury

7   and current condition of the Plaintiff was "due to decreased blood flow, decreased oxygen

8   delivery to the brain occurring prior to or around the time of delivery."   Id. at 22:16-23:23 (D.B.

9   at 84-85); see also id. at 58:12-20.   From the deposition, it appears that Dr. Murphy's custom

10  and practice in talking to parents is based on the condition and plan as expressed in the progress

11  notes; that is, Dr. Murphy discusses what appears in the medical records.   See id. at 21:6-21

12  (D.B. at 83); D.B. at 73-79.   The progress notes for November 11 and November 13, 2000, both

13  describe Plaintiff's condition and plan of treatment and include an assessment of hypoxic

14  ischemic injury.   See D.B. at 74, 78.[23]   The records for November 11 indicate that Dr. Murphy

15

16  the extent the Court relies on Dr. Grover's declaration or deposition to resolve this motion, Plaintiff's objections will
    be overruled.

17

18  [20]Although Dr. Grover may have gotten his information from Dr. Murphy and Dr. Murphy personally uses
    the term "injury" instead of "damage," the Court finds that these two terms are similar and that Dr. Grover told
19  Plaintiff's parents that Plaintiff had brain damage.

20  [21]These conversations were documented by Dr. Grover.   See D.B. at 37-38.

21  [22]Plaintiff objects that an insufficient foundation has been laid for Dr. Murphy's custom and practice.   Dr.
    Murphy testified that at the time he saw Plaintiff, he had seen over 100 similarly situated patients and he had
22  developed a standard method of talking with parents of such children.   See Murphy Deposition at 21:22-22:10.
    Given this testimony and the nature of the medical profession, the Court finds this evidence is a sufficient foundation
23  for establishing Dr. Murphy's custom and habit.   Plaintiff's objection is overruled.

24  [23]Plaintiff objects that these particular records have not been properly authenticated.   In Defendant's reply
    to Plaintiff's objections at page 7 footnote 1, Defendant states that it did not anticipate an authentication objection
25  and will obtain a declaration from the custodian of records.   See Court's Docket Document No. 79.   On December
    15, 2006, defense counsel filed a declaration and attached document-custodian declarations.   The defense declaration
26  states that the attached custodian declarations are in fulfillment of their representation at page 7 footnote 1 of their
    reply.   See Court's Docket Document No. 82.   The custodian declarations are standardized and state that the
27  "attached records" are essentially business records.   See id.   No documents are attached to the custodian
    declarations.   No objection or further response has been submitted by Plaintiff.   Given the lack of response or further

28                                                                22

1  talked with Mr. Ortiz on November 10 and that Dr. Murphy would later talk to Mr. Ortiz about

2  new problems and plans.  See D.B. at 75.  From the deposition testimony, the Court interprets

3  this to mean that Dr. Murphy intended to discuss the problems and plans as outlined in the

4  November 11 progress notes with Mr. Ortiz.  On the November 13 progress note, Dr. Murphy

5  indicates that he spoke with Mr. Ortiz at length and that Mr. Ortiz had a fair understanding of the

6  problems and plans.  See D.B. at 75.

7        The questions to Dr. Murphy in the deposition are based on a probable conversation with

8  Mr. Ortiz on November 10.  See Murphy Deposition at 20:17-18 (D.B. at 82).  However, Dr.

9  Murphy was relying on his custom and practice and was sure that he followed his custom and

10  practice based on notations in his progress notes.  See id. at 21:6-17 (D.B. at 83).  The Court

11  believes that Dr. Murphy informed the Ortizes of Plaintiff's hypoxic ischemic brain injury

12  sometime between November 10 and November 13.  The Court finds it very significant that on

13  November 13, Dr. Murphy noted that Mr. Ortiz had a fair understanding of the problems and

14  plans regarding Plaintiff.  Based on the custom and practice of Dr. Murphy, the progress notes,

15  Dr. Murphy's certainty, and Dr. Grover's discussions with the Ortizes, the Court finds that the

16  Ortiz's fair knowledge would have included that Plaintiff had a brain injury that was caused by a

17  lack of blood and/or oxygen flow to the brain and that occurred prior to or around the time of

18  birth.  Further Mr. Ortiz knew that Plaintiff was born dead and required resuscitation

19  immediately after delivery and that the pregnancy until delivery had been otherwise

20  unremarkable.  Accordingly, the Court finds that the Ortizes knew or should have known of

21  Plaintiff's brain injury and its cause on November 13, 2000.

22        That the Ortizes did not know that Plaintiff had cerebral palsy or did not know how long-

23  term or permanent the brain injury may be goes to the extent of the injury; it does not affect

24  knowledge of injury.  See T.L., 443 F.3d. at 962; Ashley, 413 F.2d at 493.  Also, that the Ortizes

25

26  objection, and given the representation that the custodian declarations fulfill the representations made at page 7

27  footnote 1 of Defendant's reply which particularly deals with D.B. at 73-79, the Court finds that the custodian
    declaration covers D.B. at 73-79.  Accordingly, Plaintiff's authentication objection is overruled.

28                                          23

did not know that Dr. Diego used a vacuum, which apparently caused the shoulder dystocia, is

not dispositive.  In *Herrera-Diaz*, a case very similar to the case at bar, the child was born

premature in November 1977, and the mother knew that her child was born blue and had

breathing problems.  See Herrera-Diaz, 845 F.2d at 1535.  After three months, the child's mother

was told by a treating physician that the child had suffered brain damage.  See id. at 1536.  After

six-months (April 1978), the child was diagnosed with cerebral palsy and told that cerebral palsy

often occurred in premature babies and was caused by a lack of oxygen to the brain around the

time of birth.  See id.  The mother did not inquire as to what had caused the lack of oxygen or

consider that government doctors had somehow caused the lack of oxygen.  See id.  The plaintiff

presented her administrative claim in 1984 and suit was filed in 1985.  See id.  The district court

dismissed the claim based on the two-year FTCA statute of limitations.  See id.  The Ninth

Circuit affirmed the dismissal and explained:

> In the present case, Mrs. Herrera-Diaz knew approximately seven hours after
> Victor was born that he appeared to be blue and dark in color and that he suffered
> from 'breathing problems.'  When Victor was three months old, Mrs. Herrera-
> Diaz was told that he had brain damage, but she did not inquire about its cause.
> By her own admission, she did not really want to know the cause. *By 1978, when
> Victor was approximately six months old, Mrs. Herrera-Diaz was told that Victor
> suffered from cerebral palsy which was caused by a lack of oxygen to the brain at
> or near the time of birth.  At that time she knew, or in the exercise of reasonable
> diligence should have discovered, both Victor's injury and its cause.  The two-
> year statute of limitations began to run at this point.* She then had the 'burden to
> ascertain the existence and source of fault within the statutory period. . . . In the
> absence of fraudulent concealment it [was her] burden, within the statutory period,
> to determine whether and whom to sue.'

Id. at 1537 (citations omitted) (emphasis added).

Here, like *Herrera-Diaz*, the Ortizes knew that Plaintiff had a brain injury.  When they

were told that the brain damage was due to lack of oxygen prior to or around the time of birth,

coupled with an otherwise unremarkable pregnancy prior to delivery and Mr. Ortiz's knowledge

that Plaintiff was born dead and required resuscitation immediately after birth, the Ortizes knew

or should have known of Plaintiff's injury and its cause.  See id.  That they did not know that Dr.

24

Diego may have caused the lack of oxygen and blood flow does not change the result.[24]  See id. at 1536-38.

Given the evidence before the Court and the notation of November 13, 2000, by Dr. Murphy that Mr. Ortiz had a fair understanding of the problems and plans, the statute of limitations began to run on November 13, 2000.  See id.

### 3.    Constructive Filing Under 28 C.F.R. § 14.2(b)(1)

Given the November 13, 2000, accrual date, Plaintiff had until November 13, 2002, to present his claim to HHS.  The claim in this case was presented to HHS on December 27, 2002, which is beyond the November 13, 2002, deadline.  Since the claim was not actually timely presented to HHS, Plaintiff must rely on constructive filing under the transfer regulation, 28 C.F.R. § 14.2(b)(1).

Defendant argues that constructive filing under § 14.2(b)(1) is not applicable.  First, Defendant argues that the transfer regulation is merely an administrative tool, and since waivers of qualified immunity are strictly construed, § 14.2(b)(1) as a regulation cannot expand the waiver of sovereign immunity beyond what Congress expressly provided.  Second, Defendant argues that Plaintiff's attorneys knew of the alleged negligence in September 2001, but did not file.  Further, GVHC provided Plaintiff's counsel with the proper FTCA claim form and filled in the proper address of HHS.  There is no explanation why Plaintiff submitted her form to the Navy and not HHS.  Third, Defendant argues that Plaintiff waited until the last minute to file and, since Brown testified that it could have taken him up to 10 days to transfer the claim to the

_____

[24]Plaintiff relies heavily on *Colleen*.  In *Colleen*, after a "rough birth," physicians told the parents that they had delivered the child in time and that the child would be fine.  See Colleen 843 F.2d at 330.  Importantly, "At no time were the Dearings told that Michelle had suffered brain damage or that she had been deprived of oxygen during birth."  Id.  In the case at bar, the Ortizes were told that Plaintiff had sustained a brain injury, the medical cause, and they were not given an assurance like the doctors gave in *Colleen*.  That an unknown doctor after birth told Mrs. Ortiz that Plaintiff was doing well or that unknown nurses periodically may have said that Plaintiff was okay is ambiguous, is not the same as saying that doctors had gotten to Plaintiff *in time* and that he would be fine, and does not refute that Drs. Wang, Grover, and Murphy told the Ortizes that Plaintiff had sustained a brain injury.  Dr. Wang and Dr. Murphy may have said that there were uncertainties, but that is not the same as saying that there was no brain injury.  *Colleen* is distinguishable and does not control this case.

1  San Diego naval station, there would have been insufficient time to investigate and determine

2  that there was no Navy involvement and transfer the claim to HHS.  Also, because the claim

3  form identifies the Navy as the appropriate agency, the Navy could assume that it had the

4  statutory six month period in which to investigate the claim.  Given the last minute filing,

5  Defendant argues that constructive filing should be unavailable.

6      Defendant's argument has some force.  Conspicuously absent from Plaintiff's briefing is

7  an explanation why they sent the claim to the Navy and not to HHS.[25]  The declaration of

8  Plaintiff's counsel states that when they heard nothing from the Navy in late November/early

9  December, they researched the issue, determined that HHS was the appropriate agency, and sent

10 the claim to HHS on December 24.  See P.B. at 188-189.  There is no explanation why that

11 research was not done earlier, especially if negligence was suspected or known in September

12 2001.  See D.B. at 139.  Further, the letter from GVHC is troubling in that a claim form with

13 HHS's address was sent to Plaintiff's counsel in May 2002, and Plaintiff has not denied receiving

14 that letter.  See December 11, 2006, Didier Declaration Exhibit 2.  However, GVHC's letter is

15 very brief and its effect is somewhat lessened in that Defendant's undisputed fact indicates that

16 Dr. Diego was sent an intent to sue letter, but Dr. Diego is nowhere mentioned in GVHC's letter.

17 See id.; DUMF No. 20.  Nevertheless, given the interpretation of § 14.2(b)(1), the Court believes

18 that it is constrained to reject Defendant's argument.

19     The strength of Defendant's position is its focus on Plaintiff's apparent lack of diligence

20 and failure to file with the appropriate agency.  There is no question that Plaintiff (through his

21 parents) is under an obligation to diligently pursue his claims and to file his claim with the

22 appropriate agency.  However, there is another obligation involved, and that obligation is on the

23 Navy.

24     Since there is no dispute that the October 2002 claim was a misfiled claim, i.e. a claim

25 filed with an inappropriate agency, § 14.2(b)(1) imposed a duty on the Navy to do one of two

26

27    [25]Indeed, given the evidence that has been presented, the Court is at a loss why the claim was first filed with the Navy.

28                                    26

things:  either transfer the claim to the correct agency if the appropriate agency was identifiable from the claim or return the claim to Plaintiff.  See 28 C.F.R. § 14.2(b)(1); Kanar, 118 F.3d at 531; Hart, 116 F.3d at 1340; Greene, 872 F.2d at 236-37; Bukala, 854 F.2d at 203-04. The evidence indicates that the Navy did neither.  Brown's deposition was taken in 2006, and he indicated that two years earlier he destroyed his records from 2002, which would have included transfer or transmittal records for Plaintiff's claim.  There is no indication that the claim was assigned to a naval attorney in Norfolk or that the San Diego naval station ever received Plaintiff's claim.  With the passage of time, it is unknown what the Navy did with Plaintiff's claim.  The evidence, however, is undisputed that the Navy never responded to Plaintiff's counsel's inquiries regarding the claim and never returned the claim to Plaintiff, and HHS never received the claim from the Navy.  Accordingly, the Navy did not deal with Plaintiff's claim in a dutiful and timely fashion by either returning the claim or transferring the claim to HHS.  Cf. Bukala, 854 F.2d at 204; Oquendo-Ayala, 30 F.Supp.2d at 195-96.

Because the Navy did not follow its obligation under § 14.2(b)(1), the key becomes whether Plaintiff's claim was filed at the last minute or the eleventh hour.  Cf. Hart, 116 F.3d at 1341; Hart, 854 F.2d at 204 n.4.  In each of the cases where constructive filing was rejected, most were within eight days of the limitations period.  See Hart, 116 F.3d at 1341; Cronauer, 394 F.Supp.2d at 100-01; Oquendo-Ayala, 30 F.Supp.2d at 195-96; Johnson, 906 F.Supp. at 1100; Lotrionte, 560 F.Supp. at 42-43.  The Court's research has found that eighteen days seems to be the longest time period that has been classified as last minute or eleventh hour.  See Massengale, 2006 U.S. Dist. LEXIS 81971 at *1-*2, *7.   Here, Plaintiff's claim accrued on November 13, 2000, and the Navy received the claim on October 11, 2002.  The claim was thus received with 33 days left before the two year statute of limitations ran.  Thirty-three days or nearly five weeks is less than the seven and nine week periods of *Blair* and *Greene*, and a far cry from the eight month period of *Bukala*.  See Greene, 872 F.2d at 236-37; Blair, 1990 U.S. Dist. LEXIS 10042, at *3, *16; Bukala, 727 F.Supp. at 384-85.  However, 33 days or nearly five weeks is significantly greater than zero, one, three, or eight days prior to the running of the limitations

27

1    period.  Cf. Hart, 116 F.3d at 1341; Cronauer, 394 F.Supp.2d at 100-01;  Oquendo-Ayala, 30

2    F.Supp.2d at 195-96; Johnson, 906 F.Supp. at 1100; Lotrionte, 560 F.Supp. at 42-43.  Further, 33

3    days is nearly double the eighteen days that was found to be last minute in *Massengale*.

4         If Brown's testimony is accurate that he would have transferred the claim to San Diego,

5    then there likely would have been less than 30 days before expiration of the limitations period in

6    which to transfer the claim from San Diego to Maryland or to return it to Plaintiff's counsel in

7    Modesto, California.   If the Navy had opted to return the claim, it would have likely arrived in

8    Modesto from San Diego quicker than from Norfolk.  However, Plaintiff's FTCA claim under

9    Block 8 identifies four possible government actors (GVHC, Doctor's Medical Center, Dr. Diego,

10   and Dr. Grover), Dr. Diego is identified as the doctor who delivered Plaintiff, and it is stated that

11   Plaintiff got stuck during delivery.  Without more, it does not seem like it should take the Navy

12   more than 30 days to determine if it was involved, and there is no evidence regarding the

13   investigative practices of either the San Diego or Norfolk[26] naval stations.[27]

14        The time periods involved in this case fall between the cases finding constructive filing

15   and cases rejecting constructive filing.  If the Navy had received the claim closer to around the

16   three week mark from the limitations period, see Massengale, 2006 U.S. Dist. LEXIS 81971 at

17   *1-*2, *7, Plaintiff's claim could well be considered filed at the eleventh hour.  Nevertheless,

18   there was nearly five weeks before the limitations period ran, which is nearly double the longest

19   held "eleventh hour" period of 18 days and is significantly longer than the typical last minute

20   cases, which thus far have been approximately one week from the limitations period.  Further, it

21   has not been shown that 33 days was insufficient time for the Navy to either transfer or return the

22   claim in a dutiful or timely fashion.  Accordingly, the Court will find that the October 11, 2002,

23   filing was not last minute or eleventh hour.  Cf. Hart, 116 F.3d at 1341; Cronauer, 394 F.Supp.2d

24

25        [26]Brown did discuss transfer of claims, but did not discuss investigations.

26        [27]The Court is not holding that the Navy's duty is to return or transfer a claim prior to the running of the
     statute of limitations.  Instead, the Navy's obligation is to dutifully and timely transfer or return a claim.  See Bukala,

27   854 F.2d at 203-04.  If the inappropriate agency dutifully and timely transfers or returns the claim, but the claim is
     received after the running of the limitations period, the claim will be time barred.  See id.

28                                                  28

1  at 100-01;  Oquendo-Ayala, 30 F.Supp.2d at 195-96; Johnson, 906 F.Supp. at 1100; Lotriente,

2  560 F.Supp. at 42-43.

3       Since  Plaintiff's claim with the Navy was not filed at the last minute or the eleventh

4  hour, the Navy was under the obligation to dutifully and timely either transfer the claim to HHS

5  or return the claim to Plaintiff.  Because the Navy did not follow § 14.2(b)(1) by either

6  transferring the claim or returning it to Plaintiff in a dutiful and timely fashion, Plaintiff's claim

7  will be considered constructively filed on October 11, 2002.  See Hart, 116 F.3d at 1341; Greene,

8  872 F.2d at 237; Bukala, 854 F.2d at 204.  Since October 11, 2002, is prior to November 13,

9  2002, Plaintiff's FTCA claim is timely and this Court has jurisdiction over this case.[28]

10

11                    _____  **CONCLUSION**

12       The two-year statute of limitations for filing an administrative claim with the appropriate

13  agency is jurisdictional for FTCA suits.  After considering the evidence submitted, the Court has

14  determined that Plaintiff's claim accrued on November 13, 2000.  That is, on November 13,

15  2000, the Ortizes knew or should have known that Plaintiff sustained a brain injury that was

16  caused by a lack of oxygen and blood flow to the brain that occurred around the time of delivery.

17  HHS did not receive Plaintiff's claim until December 27, 2002.  However, the Navy received

18  Plaintiff's claim on October 11, 2002, and never transferred the claim to HHS or returned the

19  claim to Plaintiff in a dutiful and timely fashion.  Plaintiff presented the claim to the Navy with

20  33 days, nearly five weeks, before the running of the statute of limitations.  The claim was not

21  eleventh hour or last minute because 33 days, or nearly five weeks, is almost double the longest

22  last minute filing case of 18 days, and is significantly longer than the typical last minute filings

23  which are filed approximately one week before the end of the limitations period.  It is not

24

25       [28]With respect to Defendant's argument regarding § 14.2(b)(1) as improperly expanding the FTCA waiver

26  of sovereign immunity, that claim was rejected by Bukala, see Bukala, 854 F.2d at 203-04, and Bukala was adopted
    by Greene and Hart.  See Hart, 116 F.3d at 1340; Greene, 872 F.2d at 236-37.  Moreover, Defendant has cited no

27  courts that have adopted its critique of Bukala or its interpretation of § 14.2(b)(1).  Given the absence of authority
    adopting Defendant's argument, the Court will follow Bukala, Greene, and Hart.

28                                      29

apparent that 33 days would have been insufficient time for the Navy to determine its non-involvement and either transfer the claim to HHS or return the claim to Plaintiff.  Since the Navy did not meet its obligations under § 14.2(b)(1) and the claim was not filed at the last minute or eleventh hour, the claim was constructively filed on October 11, 2002, and this Court has jurisdiction.[29]

Accordingly, IT IS HEREBY ORDERED that Defendant's Rule 12(b)(1) motion to dismiss is DENIED.

IT IS SO ORDERED.

**Dated:      February 1, 2007                           /s/ Anthony W. Ishii**
0m8i78                                              UNITED STATES DISTRICT JUDGE

---

[29]Defendant's motion is styled "in the alternative motion for summary judgment."  The scheduling order deadline for summary judgment motions had expired by the time Defendant filed this motion.  Cf. Court's Docket Document No. 60 with Document No. 68.  A separate minute order was entered that allowed for the filing of a motion to dismiss, but the minute order is silent on the subject of a late summary judgment motion.  See  Court's Docket Document No. 66.  Further, given the Court's resolution of these issues, it is not apparent that a different result would occur in the context of summary judgment.  For these reasons, Defendant's untimely alternative summary judgment request is denied.